IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KENRIC GRIFFIN, | § | |
| Movant, | § | |
| | § | |
| | § | No. 3:24-cv-1530-X |
| v. | § | No. 3:19-cr-0439-X-3 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## <u>MEMORANDUM ORDER AND OPINION</u>

Before the Court are Movant Kenric Griffin's ("Griffin") motion to vacate, set aside or correct his federal sentence under 28 U.S.C. § 2255 and Motion to Stay Opinion or Order for Sixty Days.[1] For the following reasons, the Court **DENIES** Griffin's § 2255 motion, and **FINDS AS MOOT** his Motion to Stay Opinion or Order for Sixty Days.

### I.    BACKGROUND

Following a twelve-day trial, a jury convicted Griffin, Bruce Stroud, and Bobbi Stroud (collectively "Defendants") of a conspiracy to defraud the United States and to pay and receive kickbacks in violation of 18 U.S.C. §371 and seven counts of payment of kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(1) and (2) (the "Anti-Kickback Statute").[2]

---

[1] Civ. Docs. 1, 10.

[2] Crim. Doc. 222.

Defendants were involved with three durable medical equipment ("DME") companies: New Horizons Durable Medical Equipment LLC; 4B Ortho Supply, LLC; and Striffin Medical Supplies, LLC (collectively, "the DME Suppliers").[3] Griffin had an ownership interest in Striffin and New Horizon.[4] The DME Suppliers paid more than $3 million in kickbacks to two Florida-based marketing companies in exchange for signed doctors' orders that they used to bill Medicare for medically unnecessary DME.[5]

On paper, the marketing companies that the DME Suppliers contracted with offered marketing and back-office services. But their true business model consisted of telemarketers cold calling possible Medicare beneficiaries about DME.[6] If a call recipient showed interest in DME and had Medicare coverage, the marketing companies would arrange a telemedicine appointment for the recipient.[7] The referred telemedicine doctor would then write a DME prescription for the beneficiary, and, in return, receive kickbacks from the marketing companies. The marketing companies, in turn, received kickbacks from the DME Suppliers in exchange for signed doctors'

---

[3] *See United States v. Stroud*, 2025 WL 1113223, at *1 (5th Cir. Apr. 15, 2025) (per curiam)

[4] Civ. Doc. 1-1 at 9-10.

[5] *See Stroud,* 2025 WL 1113223, at *1; Crim. Doc. 286 at 181-82 (Gov. Exh. 450); Crim. Doc. 286-1 at 204-05 (Gov. Exh. 485).

[6] *See Stroud*, 2025 WL 1113223, at *1.

[7] *Id.*

orders, which allowed the DME Suppliers to send DME to beneficiaries and then bill Medicare for reimbursement.[8]

To conceal their scheme, each of the DME Suppliers entered written contracts with the marketing companies, agreeing to pay a weekly fee in exchange for marketing and other back-office services.[9] So on the surface, these contracts complied with a safe-harbor to the Anti-Kickback Statute, allowing a fixed payment for referrals, regardless of whether they result in a Medicare payout.[10] But under the true business model, established through oral agreement, Defendants would pay the marketing companies kickbacks only for patient referrals yielding a Medicare payout.[11] There was no fixed subscription fee, and the weekly amount Defendants paid depended on the number of Medicare-reimbursed doctors' orders a marketing company referred to Defendants.[12] Further, if the DME did not receive reimbursement because the beneficiary did not have Medicare coverage or chose to return the device, Defendants would get a "credit" from the marketing company supplying that order.[13]

---

[8] *See id.*

[9] *Id.*

[10] *See, e.g.*, 42 C.F.R. § 1001.952.

[11] *See Stroud*, 2025 WL 1113223, at *2.

[12] *Id.*

[13] *Id.*

The Government presented evidence of Griffin's knowledge of and involvement in this scheme.[14] The Government showed that Griffin spoke with beneficiaries complaining of Medicare fraud and reported it to his co-conspirators to cover it up.[15] Several witnesses who received braces from Defendants' companies testified that their braces were not wanted, not needed, and/or not prescribed to them after contact with a medical professional.[16] And the Government introduced evidence and testimony that Griffin was aware of beneficiaries' complaints regarding unwanted and unneeded braces.[17] The Government also presented evidence showing that Griffin knew that the agreements the DME Suppliers entered with the marketing companies were fraudulent and designed to hide the reality of the business.[18]

In all, Defendants submitted false claims in excess of $12 million to Medicare, receiving more than $6.6 million.[19]

On July 6, 2023, Griffin was sentenced to 49 months' imprisonment and a year of supervised release.[20] He did not appeal his conviction or sentence. On June 20, 2024, he filed his § 2255 motion claiming that his counsel was ineffective for failing

---

[14] *See, e.g.*, Crim. Doc. 300 at 257-260 (Testimony of Sean Aaronson).

[15] *See* Crim. Doc. 289-1 (Gov. Exh. 1211).

[16] Crim. Doc. 290-1 (Gov. Exh. 1230).

[17] Crim. Doc. 289-1 at 198 (Gov. Exh. 1211); *see also* Crim. Doc. 300 at 85-94 (Testimony of Michele Neidlinger).

[18] Crim. Doc. 306 at 95-97 (Testimony of Valerie Eastwood).

[19] *See* Crim. Doc. 289-1 (Gov. Exh. 818).

[20] Crim. Doc. 340.

to call him to testify.[21] The Government responded to Griffin's § 2255 motion.[22] Griffin did not file a reply.[23]

## II.    LEGAL STANDARD

After conviction and exhaustion or waiver of the right to direct appeal, the court presumes that a defendant has been fairly and finally convicted.[24] Post-conviction "[r]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."[25]

## III.    ANALYSIS

Griffin raises one ground for relief: that his trial counsel was constitutionally ineffective for failing to call him to testify.[26] According to Griffin, the only disputed element of the Government's case was whether he acted knowingly or intentionally in conspiring to defraud the United States and in violating the Anti-Kickback Statute,

---

[21] Civ. Doc. 1 at 4.

[22] Civ. Doc. 5.

[23] Griffin was released from imprisonment on December 18, 2025, but remains on supervised release. *See* Inmate Locator (search for Kenric Griffin) (last visited April 17, 2026).

[24] *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998) (citing *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (en banc)).

[25] *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996) (cleaned up); *see also United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001) ("A defendant can challenge a final conviction, but only on issues of constitutional or jurisdictional magnitude.").

[26] Civ. Doc. 1 at 4.

and calling him to the stand was the best way to convince the jury that he did not act with the required intent.[27]

Ultimately, however, Griffin establishes neither ineffectiveness nor prejudice for this claim under *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

### A.    Ineffective Assistance of Counsel Standards

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal.[28] Under *Strickland*, to successfully plead a claim of ineffective assistance of counsel, the movant must demonstrate (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and (2) absent counsel's deficient performance, the legal proceedings may have been different.[29] Failure to establish either prong of *Strickland* requires a finding that counsel's performance was constitutionally effective.[30] The court may address the prongs in any order.[31]

In determining whether counsel's performance was deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[32] Counsel's advice on whether a defendant will testify is part

---

[27] *See generally* Civ. Doc. 1-1 at 30, 33.

[28] *Strickland*, 466 U.S. at 686; *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

[29] 466 U.S. at 687.

[30] *Id.* at 697.

[31] *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

[32] *Strickland*, 466 U.S. at 689.

of counsel's trial strategy.[33] The defendant must overcome a strong presumption that counsel's decision not to put the defendant on the stand was sound trial strategy.[34] "[T]he decision whether to put a defendant on the stand is a 'judgment call' which should not easily be condemned with the benefit of hindsight."[35] "At the same time it cannot be permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice."[36] This is because a defendant has a personal constitutional right to testify that may not be waived by counsel as a matter of trial strategy.[37]

To establish prejudice under the second prong, "the defendant must show that his attorney's errors were so serious that they rendered 'the result of the trial unreliable or the proceeding fundamentally unfair.'"[38] The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[33] *See Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001).

[34] *Id.*; *see also Robison v. Johnson*, 151 F.3d 256, 262 (5th Cir. 1998) (finding that counsel's recommendation that the defendant not testify was reasonable trial strategy); *Hollenbeck v. Estelle*, 672 F.2d 451, 454 (5th Cir. 1982) (stating that the decision not to put the defendant on the stand was trial strategy).

[35] *Robison*, 151 F.3d at 261 (quoting *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985)).

[36] *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002).

[37] *Id.* (citing *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984)).

[38] *United States v. Bernard*, 762 F.3d 467, 471 (5th Cir. 2014) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

result of the proceeding would have been different."[39] "This is a heavy burden which requires a 'substantial,' and not just a 'conceivable,' likelihood of a different result."[40]

### B.    Griffin fails to show ineffectiveness.

Griffin alleges that his trial counsel never prepared him to testify and advised against testifying—advice that Griffin ultimately agreed to.[41] Indeed, the Court questioned Griffin about his decision not to testify, to ensure that it was voluntary and informed, and Griffin ensured the Court that it was:

> The Court: Mr. Griffin, you probably talked through all of the issues with your attorneys on the pros and cons of testifying or not testifying.
>
> There are a lot of reasons to take either fork in the road, right? If you testify, that can open up information about your past that the Government is entitled to talk about. If you don't testify, they obviously can't go into that. There are a host of different reasons that you and your lawyers have probably talked about.
>
> What I want to make sure is that at the end of the day, it's got to be your decision, not a decision of someone else holding it over you, not a decision of a lawyer and you're just blindly trusting them.
>
> Is it your decision to not take the stand and testify today, Mr. Griffin?
>
> Griffin: It is your Honor.[42]

---

[39] *Strickland*, 466 U.S. at 694.

[40] *United States v. Wines*, 691 F.3d 599, 604 (5th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

[41] Civ. Doc. 1-1 at 32.

[42] Crim. Doc. 306 at 209.

Despite that, Griffin now claims that "after three weeks of trial, there had been no preparation for [him] to testify," which is why he ultimately decided not to testify.[43] And during the discussion about whether to testify, he says trial counsel "simply told Griffin that testifying would be a poor choice because the Government could bring up negative things about Griffin," even though Griffin had no criminal history.[44]

These allegations fail to establish ineffectiveness. Griffin does not allege that his counsel would have refused to prepare him had he insisted on testifying. He does not explain why extensive time was needed to prepare him to testify. So to the extent that Griffin's claim is that trial counsel was ineffective for failing to prepare him to testify, it is too conclusory to support habeas relief.[45]

To the extent that Griffin believes his counsel's advice not to testify was flawed, he fails to rebut the "strong presumption" that this was a reasonable trial strategy. He presents no evidence, such as a sworn declaration, detailing why, exactly, his trial counsel advised him against testifying. He suggests in his brief that his counsel's advice hinged on the Government being able to bring up "negative things" about him on cross, and he now questions that advice given his lack of criminal history and supposed willingness to admit all the elements of the offense.[46]

---

[43] Civ. Doc. 1-1 at 33.

[44] *Id.* at 32.

[45] *See, e.g., Sevim v. United States*, 2018 WL 4762140, at *3 (W.D. Tex. Oct. 1, 2018) ("Conclusory allegations of ineffective assistance of counsel are insufficient to warrant an evidentiary hearing or to support relief pursuant to section 2255." (cleaned up)).

[46] Civ. Doc. 1-1 at 32.

But there were reasons besides criminal history counseling against Griffin testifying. As the Government notes, counsel's strategy was to point the finger at Griffin's co-conspirators and to try to show that Griffin himself lacked any intent to commit fraud.[47] This strategy might have taken a hit had Griffin taken the stand and been forced to explain away substantial evidence of his guilt. Griffin would have faced a tough cross-examination during which he would have to answer for knowingly entering sham contracts during the conspiracy. Griffin does not acknowledge, much less grapple with, these countervailing considerations. His failure to show that there was no legitimate tactical reason for his counsel's advice not to take the stand defeats his ineffective assistance of counsel claim.[48]

## C.    Griffin also fails to show prejudice.

Even if Griffin could show his trial counsel's performance was constitutionally unreasonable, he still must show a "substantial likelihood" of a different outcome had he taken he stand, and he does not meet that standard. Griffin says that he would have testified on several issues bolstering his defense that he relied on the advice of counsel and did not knowingly conspire to defraud the United States or violate the Anti-Kickback Statute:

---

[47] Civ. Doc. 5 at 11.

[48] *See, e.g.*, *Thompson v. Fischer*, 2003 WL 23198787, at *17 (E.D.N.Y. Oct. 31, 2003) ("Unless a defendant can show that there was no 'legitimate reason' to pursue a particular strategy, counsel must be presumed to have rendered adequate assistance." (citing *Strickland*, 466 U.S. at 690)); *United States v. Bourgeois*, 2011 WL 1930684, at *48 (S.D. Tex. May 19, 2011) (noting that, even where the record fails to explain all of trial counsel's decision making, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" (citing *Bell v. Cone*, 535 U.S. 685, 698 (2002) (cleaned up)).

(1) He would have testified that he trusted that the DME companies he joined were operating legally and he "sought to operate within the existing structure";

(2) He would have testified that had he known the business was operating illegally, he would never have tried to bring close family friends—such as Michele Neidlinger—into the business;

(3) He would have testified that he was present when a Medicare inspector came to New Horizons and only found one technical violation related to the type of covering on the chairs;

(4) He would have testified that the different DME companies operated almost identically;

(5) He would have testified that he believed "for most of the period of the existence of the companies" that the referrals came from television or radio advertising;

(6) He would have testified that he relied on attorneys and a compliance company to review his companies and ensure they operated lawfully; and

(7) He would have testified that he was concerned about the "implications of potential audits, but never believed that he had potential exposure to criminal liability."[49]

But none of this testimony makes a different outcome "substantially" likely as opposed to just "conceivable."[50] For one thing, as the Government notes, there was substantial evidence of Griffin's guilt at trial. Many emails established that Griffin communicated with his co-conspirators regarding the scheme, paying for prescriptions, and covering up patient complaints.[51] Co-conspirators and former

---

[49] Civ. Doc. 1-1 at 35-38.

[50] *See*, *e.g,*, *United States v. Davis*, 971 F.3d 524, 530 (5th Cir. 2020) ("The likelihood of a different result must be substantial, not just conceivable.") (citation omitted).

[51] Crim. Doc. 286-1 at 204 (Gov. Exh. 485); Crim. Doc. 289-1 at 198 (Gov. Exh. 1211).

11

employees testified about Griffin's involvement in the conspiracy.[52] There was testimony that Medicare beneficiaries received braces they did not want or need.[53] Finally, ample evidence—including emails among the Defendants discussing the conspiracy and paying for doctors' orders, bank records, and numerous other documents—established that Defendant was not just a passive investor.[54] Any suggestion that the jury would have overlooked all that evidence because of Griffin's self-serving testimony is too speculative to warrant habeas relief.[55]

Additionally, Griffin's alleged reliance on the advice-of-counsel defense was no secret. Valarie Eastwood, an attorney for the Defendants, testified that Griffin consulted her regarding the brace business and that he did not disclose key details regarding the business.[56] And Griffin's trial counsel's closing argument focused heavily on the advice-of-counsel defense and lack of criminal intent.[57] Griffin fails to

---

[52] Crim. Doc. 300 at 83-85 (Testimony of Michele Neidlinger); Crim. Doc. 300 at 257-260 (Testimony of Sean Aaronson).

[53] Crim. Doc. 300 at 219-221 (Testimony of Laura Barnes); Crim. Doc. 302 at 290-292 (Testimony of Sheila Smith Thomas).

[54] Crim. Doc. 286-1 at 196 (Gov. Exh. 481); Crim. Doc. 286-1 at 204 (Gov. Exh. 485); Crim. Doc. 289-1 at 198 (Gov. Exh. 1211).

[55] *See Walker v. Lumpkin*, 2023 WL 6460501, at *18 (S.D. Tex. Oct. 3, 2023) (noting that a petitioner cannot satisfy *Strickland's* prejudice element with mere speculation and conjecture) (citing *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992)); *see also Strickland*, 466 U.S. at 695-96 (noting that when a court assesses prejudice, it "must consider the totality of the evidence before the judge or the jury" because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").

[56] Crim. Doc. 371 at 111-114 (Testimony of Valarie Eastwood).

[57] *See, e.g.*, Crim. Doc. 307 at 216-19, 228.

show that additional testimony about his reliance on counsel would have made a difference.

Griffin offers no response to these arguments. He provides no case in which a court found a defendant was prejudiced by his attorney's advice not to testify, nor has the Court located any. As best the Court can tell, what the Fifth Circuit said more than a decade ago in *Wines* remains true today: "no defendant in any court in the United States has been able to prove *Strickland* prejudice on the basis of his counsel advising him not to testify in his own defense at trial."[58] Given the overwhelming evidence of Griffin's guilt and the fact that the jury already knew that Griffin was purporting to rely on an advice-of-counsel defense and a lack of criminal intent, he fails to show a substantial likelihood of a different outcome had he testified, which disposes of his ineffective assistance of counsel claim.

## IV.   EVIDENTIARY HEARING

Generally, a district court is required to conduct an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[59] But where a § 2255 motion and the files and records of the case conclusively show that the moving party is not entitled to relief, no hearing of any kind of required.[60]

---

[58] *Wines*, 691 F.3d at 606.

[59] 28 U.S.C. § 2255.

[60] *Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1996).

Here, for the reasons already discussed, the § 2255 motion and files and records of this case show that Griffin is not entitled to relief on his ineffective assistance of counsel claim, and no evidentiary hearing is required.

## V. MOTION TO STAY

On November 21, 2025, Griffin filed a motion to stay ruling on this case for sixty days to allow his counsel to investigate an AUSA who prosecuted him and was subsequently charged with unauthorized disposal of government records.[61] But because it has been more than sixty days since Griffin filed the motion to stay a ruling and no ruling was issued in that time, he has received the relief requested in his motion to stay, so the Court will **FIND IT MOOT**.

## VI. CONCLUSION

Movant Kenric Griffin's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 is **DENIED**. Griffin's motion to stay (Civ. Doc. 10) is **MOOT**. By separate judgment, this case will be **DISMISSED WITH PREJUDICE**.

Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED this 21st of April, 2026.**

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[61] Civ. Doc. 10.

14